**Ronnie E. FAUST, Appellant,**

v.

**PUMPCO, INC., Appellee.**

**No. 06–01–00013–CV.**

Court of Appeals of Texas,
Texarkana.

Submitted Aug. 28, 2001.

Decided Oct. 2, 2001.

Rehearing Overruled Oct. 23, 2001.

Peter N. Steiner, Tony Bonilla, Bonilla & Chapa, Corpus Christi, Cecil W. Casterline, Casterline, Weed & Wood, Dallas, for appellant.

Max E. Roesch, Giddings, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

Ronnie Faust appeals from a summary judgment rendered against him in his personal injury suit. Faust, an employee of Southwestern Gas Pipeline, was seriously injured when he drove his employer's truck into a gate at Southwestern Gas's Lyons yard. The gate was an oil field gate constructed for Southwestern Gas Pipeline by Abe Mattox, an employee of Pumpco. The question is whether Mattox, in constructing the gate, was acting as an employee of Pumpco, thus making Pumpco potentially liable, or was a borrowed servant of Southwestern Gas.

 Pumpco filed a traditional motion for summary judgment under Tex.R. Civ. P. 166a(c). To be entitled to summary judgment, a movant must establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex.1979); *Baubles &*

*Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 379 (Tex.App.—Texarkana 1989, no writ). Summary judgment for a defendant is proper when the defendant negates at least one element of each of the plaintiff's theories of recovery or pleads and conclusively establishes each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997); *Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex.1993). Once the movant establishes that it is entitled to summary judgment, the burden shifts to the nonmovant to show why summary judgment should not be granted. *Casso v. Brand*, 776 S.W.2d 551, 556 (Tex.1989). Because the movant bears the burden of proof, all conflicts in the evidence are disregarded, evidence favorable to the nonmovant is taken as true, and all doubts as to the genuine issue of material fact are resolved in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

Pumpco based its summary judgment motion on its contention that it could prove the affirmative defense of borrowed servant as a matter of law. Pumpco took the position that Mattox was a borrowed servant of Southwestern Gas and was not a Pumpco employee at the time he built the gate that caused Faust's injuries and, therefore, Pumpco was not liable. The sole issue before us is whether Pumpco conclusively proved that Mattox was a borrowed servant of Southwestern Gas.

 If a regular worker of one employer is working for another employer as a "borrowed employee," the second employer is responsible for injuries sustained in the course of employment. *See Dodd v. Twin City Fire Ins. Co.*, 545 S.W.2d 766, 770 (Tex.1977). To determine whether an employee is a general employee or a borrowed employee, the fact finder determines whose work the employee is per-

forming by ascertaining who has the power to control and direct the employee in performing the work. *Castillo v. United States Fire Ins. Co.*, 953 S.W.2d 470, 473 (Tex.App.—El Paso 1997, no pet.). Several factors are to be considered in determining who has power and control over the employee: the nature of the general project, the nature of the work to be performed by the machinery and employees furnished, the length of the special employment, the type of machinery furnished, the acts representing an exercise of actual control, and the right to substitute another operator of the machinery. *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 226 (Tex.1963). An additional factor to be considered is any contract language between the two parties addressing the right to control. *Exxon Corp. v. Perez*, 842 S.W.2d 629, 630 (Tex.1992).

▌ In support of its motion for summary judgment, Pumpco submitted affidavits from Mattox, Alan B. Roberts (president of Pumpco), and J.W. Varner (senior vice president of Southwestern Gas). Pumpco also submitted deposition excerpts from Tim Cason (Southwestern Gas's field operations foreman at the Lyons yard), Bobby Aaron (materials control manager for Southwestern Gas), and Faust.

Mattox stated in his affidavit that Pumpco hired him as a contract welder to perform pipeline welding services for its customers. Mattox stated that he provided his own tools, welding machine, and welding truck, and that he had to pass a welding test administered by Southwestern Gas in order to qualify to work for it. Pumpco instructed him to report to Southwestern Gas's Lyons yard and that he was to receive instructions directly from the Lyons yard supervisor. Mattox stated that each morning he would report to the yard and check in with Tim Cason or Hal Alford, the yard supervisors, and that he would be instructed by them regarding where to report, what job to do, what materials to use, how to perform the job, and when to cease work. Mattox stated that Pumpco had no say in these matters and that "[t]hese decisions were always made solely by employees of Southwestern Gas."

In reference to his constructing the gate, Mattox stated that he was given explicit instructions by Southwestern Gas employees about the type of gate, the construction of the gate, the materials to be used, the size and dimensions of the gate, and the locking mechanism to be used on the gate. Mattox stated that he followed the instructions of Southwestern Gas employees without deviation and that neither he nor Pumpco had any decision-making powers concerning the gate.

Roberts stated in his affidavit that it was the common practice of Pumpco to assign its welders to certain customers when they were requested. The common practice at Pumpco was that the welders were then under the complete control of the customer, and the welders were told as much by Pumpco. Roberts said that Pumpco had no knowledge of what tasks Southwestern Gas wanted Mattox to perform or how long Mattox would be needed by Southwestern Gas. He also stated that all work to be performed by Mattox was to take place on Southwestern Gas's premises or any related premises, not "out in the field." Roberts additionally stated that he was unaware of the specific type of work being performed by Mattox at the time Mattox worked for Southwestern Gas, that he had no right to control Mattox's work at Southwestern Gas, and that Southwestern Gas utilized Mattox's services for several months.

Cason stated in his deposition that he had the authority to send Pumpco personnel home if they were not qualified for a job. He further stated that Pumpco pro-

vided welders to Southwestern Gas on its request, that Mattox used his own truck and welding machine on the job, that he had passed Southwestern Gas's welding test, that he or another Southwestern Gas employee exercised control over Mattox's work, and that he gave Mattox direction by authority of the master service agreement between Pumpco and Southwestern Gas. He stated that Southwestern Gas, not Mattox, controlled the specifications of the gate and fence, the location of the gate and fence, and the design of the gate and fence.

Varner stated in his affidavit that typically Pumpco provided Southwestern Gas with employees and equipment at locations other than the Lyons yard and that when services were rendered off the yard, Pumpco employees were not subject to the direction of Southwestern Gas. However, any work done on the Lyons yard by a Pumpco contractor was done at the direction of Southwestern Gas. Varner stated that the construction of the gate and fence was done by Pumpco personnel acting under the direct supervision and control of Southwestern Gas.

Aaron testified in his deposition that he and other Southwestern Gas supervisors determined that a pipe fence was needed at the Lyons yard, designated the location of the gates, and specified when the fence and gates were to be built. He stated that he knew of no person besides his employer, Southwestern Gas, who had authority to determine the type of gate to be constructed.

In Faust's deposition excerpt submitted by Pumpco, he stated that although he did not know specifically who directed Mattox to construct the gate that injured him, it must have been someone with Southwestern Gas.

In response to Pumpco's motion for summary judgment, Faust submitted the master service agreement between Pumpco and Southwestern Gas, asserting that the contractual language contained in it demonstrated Pumpco's right to control Mattox. Faust also submitted additional deposition testimony from Cason and asserted that his testimony created a fact issue regarding who had control of Mattox.

The master service agreement contained the following language:

> In the performance of the work herein contemplated, Contractor [Pumpco] is an independent contractor with the sole authority to control and direct the performance of the details of the work, Company [Southwestern Gas] being interested only in the results obtained. Contractor shall, at Contractor's expense, furnish such personnel, equipment, supplies and services as Contractor may deem necessary, in its sole discretion, for the performance of the work herein contemplated, Company having no duty in such matters whatsoever.

The contract defines "the work herein contemplated" as "[p]ipeline construction and such other work as is generally performed by Contractor [Pumpco] in its usual line of service." It is undisputed that the welding at issue was not pipeline construction, so the remaining part of the definition becomes important. Indulging all inferences in favor of Faust, the act of contracting out welders could be considered work that is generally performed by Pumpco in its usual line of service.

The question, however, is whether the contract language contemplated the construction of the gate. The interpretation of contractual language is a question of law and is not a fact issue. *Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 778–79 (Tex.App.—Texarkana 1996, writ denied). "The construction of an unambig-

uous contract is a matter of law for the court. In construing a contract, the court considers the document as a whole and gives effect to the intentions of the parties as expressed in all the contractual provisions." *Chandler v. Cash*, 20 S.W.3d 69, 72 (Tex.App.—Texarkana 2000, pet. denied).

Considering the language of the contract and the relationship between the parties, it is evident that the contract's focus was on the relationship between Southwestern Gas and Pumpco regarding pipe construction, and not the ancillary service of providing contract welders to customers; therefore, the contract does not raise a fact issue as to control over Mattox. Further, despite the terms of the contract, the facts about Mattox's relationship to Southwestern Gas and the degree of its actual control over his work are not disputed, and they all show with conclusive force that Mattox was under the direct and complete control of Southwestern Gas while he was working at its yard.[1]

Faust also relies on Cason's deposition testimony to refute Pumpco's summary judgment evidence. Cason stated that he did not direct Mattox on the particular details of the job he was to perform. Faust asserts that this creates a fact issue as to who had control over Mattox. We disagree. The borrowed servant test articulated by the supreme court does not mandate that the employer articulate every detail of the servant's work. It only looks to see whether the employer has control over the nature of the general pro-

ject and the nature of the work to be performed by the borrowed servant. *Producers Chem. Co.*, 366 S.W.2d at 226. The fact that Cason did not instruct Mattox on exactly how to weld is not a factor to be considered in determining borrowed servant status and does not raise an issue about the evidence offered by Pumpco.

We conclude that Pumpco proved as a matter of law that Mattox was a borrowed servant of Southwestern Gas. The judgment is affirmed.

---

1. In a post-argument supplemental brief, Faust raises a matter mentioned in his original brief and in a footnote in his response to Pumpco's motion for summary judgment. Faust points out that Pumpco sought contractual indemnity and breach of contract remedies under its contract with Southwestern Gas, and argues that this necessarily shows Pumpco had admitted that the terms of the

contract control. This allegation is not shown by the summary judgment record, but is only set out very briefly in argument. Even if we accept the statement as true, the mere fact that Pumpco chose to seek indemnity if it was found liable is not equivalent to an admission of that liability. This contention is without merit.