

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00036-CV

———————————————

DEMETRIUS GRANT, Appellant

V.

WIND TURBINE AND ENERGY CABLES CORP. AND ARROW PERSONNEL, LLC, Appellees

---

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-312472-19

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Demetrius Grant was hired by a staffing company, Appellee Arrow Personnel, LLC, to work at Appellee Wind Turbine & Energy Cables Corp's (WTEC's) warehouse. After Grant sustained injuries from a forklift accident while working at WTEC, he sued WTEC, Arrow, and other defendants under several theories of negligence. Both WTEC and Arrow moved for summary judgment, and the trial court—after striking portions of Grant's responsive summary judgment evidence—granted the two summary judgment motions. The trial court then severed the WTEC and Arrow actions from Grant's actions against the remaining defendants, making the summary judgments final.

In four issues, Grant challenges the order striking his evidence, the two summary judgments, and the severance. Because the evidence in question was conclusory, because WTEC conclusively established that workers' compensation was Grant's exclusive remedy, and because Grant produced no more than a scintilla of evidence supporting Arrow's alleged employer-based duties, we conclude that the severance was proper to make the summary judgments final. We will affirm.

2

# I. Background[1]

Most of the relevant facts are undisputed. It is undisputed that Arrow interviewed and hired Grant and that it assigned him to work at WTEC's warehouse as a temporary worker. WTEC, in turn, provided Grant with warehouse-specific training,[2] instructed Grant on his job duties,[3] supervised Grant's activities through an on-site foreman at the warehouse, and provided the machinery and equipment used for the tasks that it assigned.[4]

About 17 days into Grant's time at the warehouse, one of the WTEC foremen instructed Grant to "go to the back" of the warehouse to help another WTEC worker, Randy.[5] At the back of the warehouse, a forklift was loading steel beams onto a "saw line"—a platform used while the workers cut the beams—while another forklift was

---

[1]Because Grant is appealing summary judgments, we recite the facts in the light most favorable to Grant, the nonmovant. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[2]The parties dispute the degree and adequacy of the training.

[3]According to Grant, WTEC told him "what to do as far as a job."

[4]The parties dispute who provided personal protective equipment; WTEC claims that it issued Grant personal protective equipment, but Grant testified that he had his own and that WTEC did not provide him with any. Viewing the evidence in the light most favorable to Grant, we take his version of events as true. *See Fielding*, 289 S.W.3d at 848.

[5]Prior to working at WTEC, Grant had multiple years of experience working as a forklift operator.

bracing the saw line from the side. Randy told Grant to stand near the saw line to "help and look out." According to Grant, he was "standing near the saw line, observing as other workers loaded steel beams into the saw line," when there was a mishap with one of the forklifts (allegedly due to driver error, faulty machinery, or improper use of the equipment[6]), and the forklift jerked unexpectedly. The jerking motion caused a large steel beam to shift or fall toward Grant, trapping his hand and cutting his arm. Grant alleges that the forklift incident "nearly sever[ed]" his hand.

He sued WTEC, Arrow, and an ambiguous number of other entities[7] for negligence, negligence per se, and gross negligence. Grant's petition did not distinguish

---

[6]In his deposition, Grant confirmed that there was "[n]o problem with the forklift as far as [he] knew," and that there was "[n]o problem with the operation of the forklift as far as [he] knew." But later in the same deposition, Grant confirmed that it was his "understanding that the gentleman operating the forklift on this day had not been trained." And Grant's pleadings repeatedly reference WTEC's internal investigation, which concluded that the forklift incident was the result of a "[h]yster forklift being used [that] was not meant for production use," the forklift operator "not [being] properly trained," and "[m]iscommunication between [the] spotter . . . and [the] forklift operator."

[7]Grant's live petition names four defendants in the style, but later in the petition, Grant lists the same entity—"Wind Turbine and Energy Cables Corp."—twice, first alleging that it is a foreign corporation with a registered agent in Dallas and then alleging that it is a Texas corporation with a registered agent in Houston. The parties thus count different numbers of defendants. The WTEC on appeal appears to be the foreign corporation with a registered agent in Dallas.

4

between the various defendants' actions in causing his injury,[8] and he alleged that none of the defendants subscribed to workers' compensation.

But WTEC was a subscriber—a fact Grant no longer denies. And WTEC filed a combination traditional and no-evidence summary judgment motion based on the workers' compensation exclusive remedy defense,[9] arguing that Grant was a borrowed servant covered by WTEC's workers' compensation policy. *See* Tex. Lab. Code Ann. § 408.001(a). Grant responded that he was not covered by WTEC's policy because Arrow—not WTEC—was his employer and because WTEC did not extend benefits to

---

[8]Grant's negligence allegations asserted that all of the defendants were directly negligent and that they were vicariously liable for their employees' negligence. He alleged that the defendants had (1) failed to provide a safe work environment; (2) hired, retained, or trained an incompetent forklift driver; (3) failed to warn him of hazards; (4) failed to operate their equipment safely; (5) failed to exercise caution; (6) failed to train their employees, (7) failed to supervise their employees; (8) violated local, state, and federal laws and regulations including Occupational Safety and Health Administration (OSHA) regulations; and (9) were vicariously liable for the conduct of their employees.

[9]Although WTEC framed its motion for summary judgment as a combination traditional and no-evidence motion, the substance of the motion was only the former. The "no-evidence" portion of WTEC's motion alleged that Grant "[wa]s still unable to offer any evidence to disprove a single element of WTEC's exclusive remedy affirmative defense." But WTEC bore the burden on its affirmative defense, and a party may file a no-evidence motion to challenge only a claim or defense on which it does not bear the burden of proof. *See* Tex. R. Civ. P. 166a(i) (providing for no-evidence summary judgment motion challenging element of claim or defense "on which an adverse party would have the burden of proof at trial").

Grant.[10]  To support his position, Grant executed a declaration,[11] and WTEC moved to strike portions of the declaration as conclusory.  After striking three statements from the declaration, the trial court granted WTEC's motion for summary judgment.

Meanwhile, Arrow filed a combination summary judgment motion of its own. Although Arrow was not a subscriber to workers' compensation, it argued that Grant had no evidence of negligence because, among other things, Arrow did not control the details of Grant's work at the time of the forklift incident; thus, it was not Grant's common law employer.  Consequently, Arrow did not owe him the employer-based duties that he alleged.[12]  The trial court again granted summary judgment.

---

[10]Grant also argued in his response to WTEC's summary judgment motion that WTEC was required to notify the Texas Workers' Compensation Commission of its subscription status and that the failure to do so was "a fatal administrative violation" that subjected both companies to common law litigation.  Grant does not reassert this argument on appeal.

[11]Generally, with exceptions not applicable here, "an unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law."  Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a).

[12]Arrow also contended that (1) it did not hire or train the forklift driver, (2) it owed no duty to warn of unknown hazards, and (3) Grant's own conduct was the sole proximate cause of his injuries.  Furthermore, Arrow contended that Grant could not rely on an OSHA violation for his negligence per se claim.  In the alternative, Arrow argued that under the one-satisfaction rule, it was entitled to an offset for the amount of WTEC's workers' compensation.  Arrow raises these arguments to support its summary judgment on appeal as well, but because we resolve the issue based on the duty element of Grant's claims, we need not address Arrow's other challenges.  *See* Tex. R. App. P. 47.1.

6

After entering the summary judgments, the trial court severed the claims against WTEC and Arrow into a single cause of action separate from the claims against the remaining defendants.

## II. Discussion

Grant raises four issues on appeal; he challenges the trial court's orders (1) striking portions of Grant's summary judgment evidence, (2) granting WTEC's motion for summary judgment, (3) granting Arrow's motion for summary judgment on Grant's negligence and negligence per se claims,[13] and (4) severing the claims against WTEC and Arrow.[14]

### A. Motion to Strike

In his third issue, Grant challenges the trial court's order striking three statements from his summary judgment declaration.

We review a trial court's ruling on a motion to strike for an abuse of discretion. *See Starwood Mgmt., LLC ex rel. Gonzalez v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017); *Hobson v. Francis*, No. 02-18-00180-CV, 2019 WL 2635562, at \*6 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.). A trial court does not abuse its discretion by striking conclusory statements from an affidavit or declaration. *See Trinity River Ests.,*

---

[13]Grant does not challenge the gross negligence portion of Arrow's summary judgment.

[14]We have reordered Grant's issues for organizational purposes.

*L.P. v. DiFonzo*, No. 2-08-393-CV, 2009 WL 1506928, at *4 (Tex. App.—Fort Worth May 28, 2009, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by granting motion to strike conclusory affidavit); *cf. A.J. Morris, M.D., P.A. v. De Lage Landen Fin. Servs., Inc.*, No. 2-06-430-CV, 2009 WL 161065, at *4 (Tex. App.—Fort Worth Jan. 22, 2009, no pet.) (mem. op.) (noting that "[a]n objection that a statement is conclusory is an objection to substance"); *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006, no pet.) (noting that conclusory statements are not credible). "A statement is conclusory when it does not provide the underlying facts to support it." *A.J. Morris*, 2009 WL 161065, at *4; *see Residential Dynamics*, 186 S.W.3d at 198 (similar); *cf.* Tex. R. Civ. P. 166a(f) (requiring that summary judgment affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein").

Here, the trial court struck as conclusory the following three statements from Grant's declaration:

> [1]  Due to an untrained forklift operator, poor communication, and a forklift that was not properly maintained, the steel beam fell from the assembly line onto my arm and wrist, nearly severing my hand off.
>
> [2]  WTEC did not control the details of the job task I was performing at the time I sustained injuries.
>
> [3]  I was not covered under any workers compensation insurance policy at the time of my injuries.

[Indentation altered.] Grant argues that these statements were not conclusory because they were based on facts "known to [Grant] when he made the[ declaration]," including "WTEC and Arrow's own admissions during the litigation process."

But the question is not whether the three statements were based on unspoken facts "known to [Grant]"—the question is whether the declaration *articulated* the underlying facts to support the challenged statements. *See A.J. Morris*, 2009 WL 161065, at *4; *see also Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (holding that affidavit stating that contractual obligation had been modified "asserted nothing more than a legal conclusion" and "should have gone further and specified factual matters such as the time, place, and exact nature of the alleged modification").

Grant's declaration did not do so. Even assuming that he was aware of facts to support the three statements, he did not enunciate those facts in his declaration. For example, he did not support his first statement by explaining how he knew that the forklift driver was "untrained," what training the driver lacked, who said or did what in the exchange of "poor communication," how he knew that an unspecified component of the forklift had been improperly maintained, or why he believed that any of these events caused the steel beam to fall. Nor was his second statement (regarding WTEC's alleged lack of control) supported with any explanation of the "job task" that he was completing when he was injured, what "details of th[at] job task" WTEC allegedly lacked control over, or who—other than WTEC—he looked to for instruction for the "details of th[at] task." And his third statement was similarly lacking. By simply stating

9

that he was "not covered under any workers compensation insurance," Grant left unaddressed the facts underlying this conclusion, i.e., what company he considered his "employer" for purposes of workers' compensation, how he gained firsthand knowledge of the company's workers' compensation coverage, why he believed himself to be outside of that company's coverage, or why he believed that the company was a nonsubscriber.

These three statements thus asserted bare opinions and conclusions without supporting facts, and the trial court did not abuse its discretion by striking the statements as conclusory. *See Brownlee*, 665 S.W.2d at 112 (recognizing that "[a]ffidavits consisting only of conclusions are insufficient to raise an issue of fact"). We overrule Grant's third issue.

## B. Summary Judgment for WTEC

Grant argues in his first issue that, even without the three statements, the trial court erred by granting WTEC's motion for summary judgment because he raised genuine issues of material fact as to (1) whether he qualified as WTEC's "employee" within the meaning of the Workers' Compensation Act (the Act) and (2) whether WTEC's workers' compensation policy extended to temporary workers.

### 1. Standard of Review

We review a summary judgment de novo. *Tex. Workforce Comm'n v. Wichita Cnty.*, 548 S.W.3d 489, 492 (Tex. 2018). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if

10

reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311–12 (Tex. 2014); *Fielding*, 289 S.W.3d at 848. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all elements of that defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *see* Tex. R. Civ. P. 166a(b), (c). If a defendant meets this burden, the burden shifts to the plaintiff to avoid summary judgment by raising a genuine issue of material fact on the affirmative defense. *Draughon v. Johnson*, 631 S.W.3d 81, 87–90 (Tex. 2021); *Robinson v. Cox*, No. 02-19-00370-CV, 2020 WL 7063289, at *1 (Tex. App.—Fort Worth Dec. 3, 2020, no pet.) (mem. op.).

WTEC was granted summary judgment on its exclusive remedy affirmative defense under the Act. [15] *See* Tex. Lab. Code Ann. § 408.001(a). "Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage . . . against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee." *Id.*; *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 277 (Tex. 2021) (quoting Section

---

[15]Although the trial court did not specify the basis for its order granting WTEC summary judgment, WTEC's summary judgment motion relied solely on the exclusive remedy defense.

408.001); *see Port Elevator-Brownsville, L.L.C. v. Casados*, 358 S.W.3d 238, 243 (Tex. 2012) (stating that "a client company is entitled to the exclusive remedy defense upon showing that it was the plaintiff's employer and that it was covered by a workers' compensation policy"). On appeal, Grant challenges two elements of this defense: (1) whether he was an "employee" within the meaning of the Act, and (2) whether he was "covered by [WTEC's] workers' compensation insurance coverage." Tex. Lab. Code Ann. § 408.001(a).

## 2. The Meaning of "Employee" Under the Workers' Compensation Act

To establish its exclusive remedy defense, WTEC was required to conclusively prove that Grant qualified as WTEC's "employee" under the Act. *See* Tex. Lab. Code Ann. § 401.012; *Waste Mgmt. of Tex.*, 622 S.W.3d at 277. In doing so, WTEC relied on the borrowed servant doctrine.

### a. The Law on Employment Status and the Right to Control

The Act defines an "employee" as "each person in the service of another under a contract of hire, whether express or implied, or oral or written."[16] Tex. Lab. Code Ann. § 401.012(a). Under Texas Supreme Court precedent, an individual qualifies as a company's "employee" within the meaning of the Act if the company "has the right to control the progress, details, and methods of operations of the [employee's] work."

---

[16]The Act defines an "employer" as "a person who makes a contract of hire, employs one or more employees, and has workers' compensation insurance coverage." Tex. Lab. Code Ann. § 401.011(18).

12

*Waste Mgmt. of Tex.*, 622 S.W.3d at 277 (quoting *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002)).

This focus on control is not unique to the Act; it aligns with "traditional [common law] notions of what it means to be 'in the service of another.'" *Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473, 476 (Tex. 2005). And given the importance of control, it logically follows that, when control shifts, "a general or regular employee of one employer may become the borrowed employee of another with respect to some activities."[17] *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2002) (plurality op.) (applying doctrine in vicarious liability case); *Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 584 (Tex. 1977) (similar, noting that the borrowed servant doctrine "cuts across the entire law of principal and agent and employer and employee"). "Accordingly, in determining if a general employee of a temporary employment agency is also an employee of a client company for purposes of the Act, we consider traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury." *Garza*, 161 S.W.3d at 477; *see St. Joseph Hosp.*, 94 S.W.3d at 537–38.

Thus, to prevail on its motion for summary judgment, WTEC was required to conclusively establish that it had the right to control the relevant details of Grant's work when the forklift incident occurred.

---

[17]This "borrowed servant" doctrine is more than a century old. *See Standard Oil Co. v. Anderson*, 212 U.S. 215, 220–27, 29 S. Ct. 252, 253–56 (1909).

### b. Conclusive Evidence of WTEC's Control

The determinative facts are undisputed. It is undisputed that WTEC leased the warehouse where the injury occurred. *See Garza*, 161 S.W.3d at 477 (noting that temporary worker "was working on [client's] premises when he was injured" and holding that client company was "employer" under the Act). It is undisputed that WTEC provided the on-site machinery—including the forklift—and that it offered the only task-specific training that Grant received. *Cf. Waste Mgmt. of Tex.*, 622 S.W.3d at 279 (holding that temporary worker's client company was "employer" under the Act when the client company "provided helpers with instructions and training"). And it is undisputed that, in Grant's words, WTEC "told [him] what to do as far as a job."[18] *Cf. id.* (holding that temporary worker's client company was "employer" under the Act in part because worker "agreed that [the client company] managers had 'the ability to tell [him] what to do and how to do [his] job'"). By Grant's own account, in the 17 days that he spent working at WTEC's facility prior to his injury, no "member of Arrow ever c[a]me on[to] WTEC's property and instruct[ed] [him] on how to do [his] job." *Cf. City of Bellaire v. Johnson*, 400 S.W.3d 922, 923 (Tex. 2013) (holding that temporary worker

---

[18]In his deposition, Grant was asked whether "WTEC ha[d] control over the details of [his] work" and he responded "[y]es." But just moments later, when he was asked whether "WTEC or Arrow [was] in charge of the details of [his] work," he responded, "Arrow," and he subsequently added that "WTEC didn't control the details of [his] work." The deposition testimony did not identify the relevant "details" that Arrow allegedly controlled.

14

was "employee" of client company under the Act and noting that the client company "gave him his assignments, and supervised his work" while staffing agency "had no role in overseeing [the plaintiff's] work").

Grant contends, though, that there was evidence that he was not under WTEC's control because he testified that his "supervisor" was an Arrow employee named Veronica. But the test does not hinge upon labels. Regardless of what title Veronica may have held, there is no evidence that she or any other Arrow employee determined the type or method of Grant's day-to-day activities within the warehouse. Rather, WTEC workers instructed Grant on what training to take, what task to perform, how to do the assigned task, what equipment to use, and even—as Grant alleges happened on the day of his injury—where to stand.

Grant testified that, at the time of his accident, he was in "the back" of the warehouse facility because, according to him, "Ruben [one of the WTEC foremen] told [him] to go to the back to help out." *See Garza*, 161 S.W.3d at 477 (holding that temporary worker's client company was "employer" under the Act in part because worker "was injured when he responded to direct instructions from [the client company] supervisor"). Grant explained that he had listened to what Ruben told him to do because Ruben was "one of the head guys" at the warehouse, and Grant admitted to performing other tasks—such as participating in safety training—at Ruben's direction as well. Whether Ruben or Veronica held the title of "supervisor," the

15

evidence identified only on-site WTEC workers as those persons who directed the warehouse tasks that Grant performed and the manner in which he performed them.

WTEC's control is consistent with the role that it agreed to assume in its contract with Arrow as well.[19] The WTEC–Arrow contract stated that WTEC would "supervise" workers assigned to its facility, provide them "with a safe work site," and provide "appropriate information, training, and safety equipment," among other things. Though not determinative, the contractual language is "a factor to be considered" in the right-to-control analysis, and it reaffirms what was demonstrated by the facts on the

---

[19]WTEC attached a copy of this agreement to its summary judgment motion along with a copy of its workers' compensation policy, and WTEC authenticated the two documents with a business records affidavit from its in-house counsel. Grant argues that the business records affidavit is conclusory and that WTEC's counsel could not attest to the relevant facts because he "was not present at the time of the incident." Grant does not identify what statement in the affidavit is allegedly conclusory. And regardless, his challenge is off base.

The sponsoring witness for a business records affidavit is not required to be "present at the time of the incident." *See* Tex. R. Evid. 803(6) (providing exception to hearsay rule for business records), 902(10) (providing form for business records affidavit based on records custodian's affirmation of predicate). Nor did WTEC's counsel claim to have been. Instead, he attested to basic corporate information about WTEC (such as its corporate headquarters and its lease of the warehouse location), he authenticated the accompanying documents, and he quoted from and highlighted portions of the WTEC–Arrow agreement. Even in highlighting portions of the agreement, the affiant merely described what WTEC and Arrow had agreed to do; he did not purport to conclude that this was what had actually occurred on the ground. *See Exxon Corp. v. Perez*, 842 S.W.2d 629, 630 (Tex. 1992) (op. on reh'g) (noting that two companies' agreement regarding control is a "factor to be considered" in the control analysis). All of these statements were within the affiant's personal knowledge based on his stated role at WTEC and the accompanying documents that he quoted and provided.

ground—that WTEC controlled Grant's task-specific training, direction, and supervision.[20] *Exxon Corp.*, 842 S.W.2d at 630 (addressing right-to-control test in workers' compensation context); *see Waste Mgmt. of Tex.*, 622 S.W.3d at 283 (quoting *Exxon* and addressing right-to-control test in workers' compensation context).

Grant emphasizes that Arrow—not WTEC—interviewed, screened, hired, and paid him. But as our sister court has explained, a staffing company's provision of payroll checks and benefits does not establish a right of control over the work performed at a client company's facility. *See Phillips v. Am. Elastomer Prods., L.L.C.*, 316 S.W.3d 181, 188 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (noting in workers' compensation case that the fact that the staffing company "issued payroll checks and paid workers' compensation to [the plaintiff] does not necessarily establish that [the staffing company] had the right of control over [the plaintiff's] work at [the client company's] rubber manufacturing plant"). "[T]he fact that the [client company] did not directly employ the worker provided by the staffing agency d[oes] not factor prominently in the [workers' compensation] analysis." *Waste Mgmt. of Tex.*, 622 S.W.3d

---

[20]Grant argues that "[e]ven considering the [WTEC–Arrow] services agreement, the record does not show that Arrow and WTEC followed and adhered to the agreement's terms" because "under its express terms, Arrow—not WTEC—was required to provide workers'[ ]compensation benefits to Grant." While this may be true, the manner in which the parties deviated from the contract—by providing workers' compensation through WTEC rather than Arrow—only further supports WTEC's position that it exercised control over Grant. Although Grant implicitly invites us to throw out the baby with the bathwater, we decline to do so. One deviation from the contract does not render the agreement wholly lacking in probative value.

17

at 279 (summarizing analyses in prior case law and holding that client company was "employer" under the Act).

More problematic, however, is that Grant's argument assumes that he can have only one "employer" under the Act, a notion that the Texas Supreme Court has rejected. *See Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 142–43 (Tex. 2003) (holding that "the express definitions of 'employer' and 'employee' [in the Act] and the exclusive remedy provision may apply to more than one employer"). In so holding, the court addressed Grant's precise situation: if an employee is "working for h[is] general employer (i.e., the temporary staffing provider), but will also be subjected to laboring in the workplace and under the direction of the general employer's client company," then "[a]n employee injured while working under the direct supervision of a client company . . . . should be able to pursue workers' compensation benefits from either." *Id.*

Moreover, Grant's own pleadings demonstrate that he looked to WTEC for his training and supervision at the warehouse on the day in question. For example, in his response to WTEC's motion for summary judgment, Grant faulted WTEC for failing to provide him with sufficient task-specific "instructions while he observed at the saw station when the incident occurred."

All of the summary judgment evidence, including Grant's testimony that WTEC "told [him] what to do as far as a job," led to the conclusion that Grant was WTEC's "employee" within the meaning of the Act. *Cf. Waste Mgmt. of Tex.*, 622 S.W.3d at 277;

*see also* Tex. Lab. Code Ann. § 401.012. Having conclusively established that WTEC controlled the "progress, details, and methods of operations of the work" and "exercised 'actual control over the details of the work that gave rise to [Grant's] injury,'" *see Waste Mgmt. of Tex.*, 622 S.W.3d at 280 (first quoting *Limestone Prods.*, 71 S.W.3d at 312; then quoting *Garza*, 161 S.W.3d at 477), the burden then shifted to Grant to offer evidence raising a genuine issue of fact on that point. *See Robinson*, 2020 WL 7063289, at *1. But he failed to do so.

### 3. Workers' Compensation Policy Coverage

Grant claims that he presented a fact question as to whether WTEC's workers' compensation policy extended to temporary workers. He argues that "WTEC's own paperwork provides that 'temp' workers do not get employment benefits" and that "[t]he record otherwise is silent about temporary workers (including so-called 'borrowed servants') being covered under WTEC's workers'[ ]compensation policy." But this argument does not raise a fact issue that would preclude summary judgment. The Texas Supreme Court has held that "an employer may not (intentionally or unintentionally) split its workforce . . . . [and] choose to exclude certain employees from coverage unless a statutory or common[ ]law exception to the rule against split workforces applies." *Port Elevator-Brownsville*, 358 S.W.3d at 243.

In *Port Elevator-Brownsville*, the court applied this "long-standing rule" to a temporary worker—Rafael Casados—who was assigned by a staffing agency to work at Port Elevator's grain storage facility. *Id.* at 240–44. While there, Casados suffered a

fatal work-related injury. *Id.* at 240. When Casados's parents sued Port Elevator for common law claims, Port Elevator raised the exclusive remedy affirmative defense, arguing that the company's workers' compensation policy extended to temporary workers like Casados.[21] *Id.* The Texas Supreme Court agreed with Port Elevator: "[B]ecause the [Act] and [Texas Supreme Court] decisions are intended to prevent an employer from splitting its workforce by choosing coverage for some employees but not coverage for all" and because there was no evidence that any of the "limited statutory or common[ ]law exceptions" to the rule against splitting workforces applied, Port Elevator was "entitled to the exclusive remedy defense upon showing that it was the plaintiff's employer and that it was covered by a workers' compensation policy." *Id.* at 242–43.

The same is true here. WTEC was prohibited from splitting its workforce absent a statutory or common law exception. Grant does not allege that any exception applies; he does not allege that WTEC "makes different elections for separate and distinct businesses"; he does not allege that he is "a sole proprietor, partner, or corporate executive officer" that WTEC was statutorily permitted to exclude from coverage, *see* Tex. Lab. Code Ann. § 406.097; and he does not allege that WTEC leased his services under the Staff Leasing Services Act, *see id.* § 91.042. *See also City of Bellaire*, 400 S.W.3d

---

[21]Before filing suit, Port Elevator's insurance carrier concluded that the workers' compensation policy did not extend to temporary employees and denied coverage of the Casadoses' claim. *Port Elevator-Brownsville*, 358 S.W.3d at 240.

at 922 n.2 (listing exceptions). And to the extent that Grant relies on his temporary-worker status as an exception to the rule against splitting workforces, no such exception exists.

Thus, whether or not WTEC's paperwork indicated that it provided temporary workers with employment benefits, WTEC could not "choose to exclude [temporary] employees from [workers' compensation] coverage," *Port Elevator-Brownsville*, 358 S.W.3d at 243, and Grant cannot avoid the exclusive remedy defense by "argu[ing] that his subscriber–employer has done what the law prohibits," *City of Bellaire*, 400 S.W.3d at 923.

### 4. Conclusion

Because the evidence conclusively establishes that Grant was WTEC's "employee" within the meaning of the Act and that WTEC had workers' compensation coverage, and because there is no evidence or allegation to support an exception to the rule against splitting workforces, the trial court properly granted summary judgment for WTEC. *See* Tex. R. Civ. P. 166a(c). We overrule Grant's first issue.

## C. Summary Judgment for Arrow

In his second issue, Grant claims that he raised a genuine fact question on each element of his negligence and negligence per se claims, thus precluding summary judgment for Arrow. But the duty element of these claims relies on Grant's

21

characterization of Arrow as his common law employer.[22]  Arrow challenged this

characterization in both its traditional and no-evidence motions for summary judgment,

and there is no evidence to support the characterization.

---

[22]Even Grant's negligence per se argument relies on his characterization of Arrow as his common law employer.  He argues that because Arrow was his employer, it had a duty to comply with 29 U.S.C.A. § 654—one of the many federal statutes on "Occupational Safety and Health."  *See* 29 U.S.C.A. §§ 651–78.  Because Grant premises his negligence per se claim on Arrow's alleged status as Grant's common law employer, the duty element of Grant's negligence per se claim falls with the duty element of his common law negligence claim.  To the extent that the statutory definition of the term "employer" in 29 U.S.C.A. § 654 differs from the common law definition of an employer, Grant has waived the issue by failing to raise or brief it.  *See* Tex. R. App. P. 38.1(i).

Plus, the Occupational Safety and Health Chapter of the United States Code provides that "[n]othing in this chapter shall be construed . . . to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment."  29 U.S.C.A. § 653(b)(4). Consequently, "Texas courts have held that the common law duties imposed by state law are not expanded by OSHA regulations"—"either a [defendant] owes a duty based upon our common law principles, or it does not."  *Hill v. Consol. Concepts, Inc.*, No. 14-05-00345-CV, 2006 WL 2506403, at *4 (Tex. App.—Houston [14th Dist.] Aug. 31, 2006, pet. denied) (mem. op.); *McClure v. Denham*, 162 S.W.3d 346, 353 (Tex. App.—Fort Worth 2005, no pet.) (affirming summary judgment on negligence per se claim based in part on Fifth Circuit's rejection of OSHA regulations as basis for negligence per se); *cf. Perez v. Smart Corp.,* No. 04-12-00712-CV, 2013 WL 6203358, at *3 (Tex. App.—San Antonio Nov. 27, 2013, pet. denied) (mem. op.) (quoting *Hill* and concluding that "[j]ust as evidence of OSHA citations and fines may not be used to establish negligence per se, we conclude that a finding of no violation of OSHA regulations is similarly inadmissible to exculpate a defendant").

### 1. Standard of Review

As with WTEC's summary judgment, we review Arrow's summary judgment de novo, *Tex. Workforce Comm'n*, 548 S.W.3d at 492, viewing the evidence in the light most favorable to Grant. *Boerjan*, 436 S.W.3d at 311–12; *Fielding*, 289 S.W.3d at 848. Because the trial court did not specify the basis for its judgment, we will affirm if any of the theories that Arrow advanced are meritorious. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen,* 525 S.W.3d 671, 680 (Tex. 2017); *Ally Fin., Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038, at *5 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.).

Because Arrow prevailed on a combination traditional and no-evidence motion for summary judgment, "the differing burdens of the two forms of summary judgment motion are of no import here." *Buck v. Palmer*, 381 S.W.3d 525, 527 n.2 (Tex. 2012). Under either standard, the ultimate question is whether there is "more than a scintilla of probative evidence raising genuine issues of material fact" on each essential element challenged by Arrow. *Id.* at 527 & n.2; *see* Tex. R. Civ. P. 166a(c), (i).

One of the challenged essential elements is the duty requirement.

### 2. Common Law Duty

"A prerequisite to tort liability is the existence of a legally cognizable duty." *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996); *Kirk v. Precis, Inc.*, No. 2-05-297-CV, 2006 WL 3627119, at *3 (Tex. App.—Fort Worth Dec. 14, 2006,

23

pet. denied) (mem. op.).[23]  All of the duties that Grant contends Arrow owed him stem from Arrow's alleged status as Grant's common law employer.  Grant argues that Arrow, as his employer, owed him a duty to provide a reasonably safe workplace, including a duty to adequately train and supervise him.  Grant concedes that there is no evidence that Arrow controlled the safety procedures, activities, or task assignments within WTEC's facility, but he argues that because Arrow provided him with the administrative indicia of employment—an interview, a salary, benefits, and the like— Arrow took on a slew of "nondelegable duties," regardless of its lack of control over the liability-producing circumstances of Grant's work.  We disagree.  Because "[t]he right of control is the 'supreme test' for determining whether a master–servant relationship exists," and because there is no evidence that Arrow had any control over the liability-producing aspects of Grant's work, Arrow was not Grant's common law employer with respect to the activities at issue.  *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied) (applying control test in vicarious liability case).

---

[23]The existence of a duty is a question of law for the court to decide based on "the facts surrounding the occurrence in question."  *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 145 (Tex. 2022) (quoting *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)).

### a. The Law on Duty and the Right to Control

Just as determining employment status under the Act turns on the question of control, so too does determining employment status for common law negligence purposes. *See Waste Mgmt. of Tex.*, 622 S.W.3d at 281 n.4 (noting that "determining employment status under the common law and doing so under the Workers' Compensation Act . . . [will] in many cases . . . look identical").[24]

Arrow argues that it was not Grant's "immediate employer" because it did not have the contractual or actual right to control Grant's workplace or the liability-producing aspects of Grant's work, i.e., Grant's safety protocols, equipment, warehouse-specific training, or supervision. This argument rings of the borrowed servant doctrine discussed above, although Arrow, unlike WTEC, does not use that phrase. Instead, Arrow implicitly invokes the doctrine as an inferential rebuttal defense that goes to the heart of the employment relationship and the duty element.[25] *See*

---

[24]Despite the similarities between the common law and the Act, employment status under the common law is distinct from that under the Act; the two inquiries "serve different purposes," so they "can diverge to some extent in the dual-employment context." *Waste Mgmt. of Tex.*, 622 S.W.3d at 281 n.4.

[25]Although this court has held that the borrowed servant doctrine is an inferential rebuttal defense, other courts have construed it as an affirmative defense. *Compare Linden-Alimak, Inc. v. McDonald*, 745 S.W.2d 82, 84 (Tex. App.—Fort Worth 1988, writ denied) (characterizing the borrowed servant doctrine as "an inferential rebuttal defense" because it "seeks to disprove the existence of an essential element submitted in another issue"; namely, "control"), *Everman Corp. v. Haws & Garrett Gen. Contractors, Inc.*, 578 S.W.2d 539, 542 (Tex. App.—Fort Worth 1979, no writ) (concluding that "[w]hether he was a borrowed servant in this context is merely inferential rebuttal and

25

*Linden-Alimak, Inc.*, 745 S.W.2d at 84; *cf.* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 52.2 (2018) (noting that doctrine applies when a general employer "seeks to rebut the employment relationship with evidence that the employee was the borrowed employee of another").

Under the borrowed servant doctrine, "a general or regular employee of one employer may become the borrowed employee of another with respect to some activities." *St. Joseph Hosp.*, 94 S.W.3d at 537; *see Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 225 (Tex. 1963). "Since the question of liability is always raised because of some specific act done [or not done], the important question is not whether . . . [the employee] remains the servant of the general employer as to matters generally," but "whether the other employer or its agents have the right to direct and control the employee with respect to the details of the particular work at issue."[26] *St. Joseph Hosp.*, 94 S.W.3d at 537; *Hilgenberg v. Elam*, 198 S.W.2d 94, 96 (Tex. 1946) (quoting

should not have been separately, or disjunctively submitted"), *and* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 52.2 (2018) (noting that doctrine is "an inferential rebuttal" defense to the general employer's liability), *with Coco v. Port of Corpus Christi Auth.*, 132 S.W.3d 689, 691 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.) ("The borrowed servant doctrine is an affirmative defense to tort liability based on respondeat superior."), *and Faust v. Pumpco, Inc.*, 57 S.W.3d 620, 622 (Tex. App.—Texarkana 2001, pet. denied) (analyzing traditional summary judgment on "the affirmative defense of borrowed servant").

[26] An employee may also "be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other." Restatement (Second) of Agency § 226 (Am. Law Inst. 1958). Grant does not argue that this principle applies here.

Restatement (First) of Agency § 227 cmt. a (Am. Law Inst. 1933), in vicarious liability case).

Here, there is no evidence that Arrow was Grant's common law employer "with respect to the . . . particular work at issue." *See St. Joseph Hosp.*, 94 S.W.3d at 537.

### b. No Evidence of Arrow's Alleged Control[27]

Grant conceded at oral argument that he did not "have any evidence . . . that Arrow specifically was able to control what was going on within WTEC's facility." Indeed, the undisputed facts demonstrate that Arrow lacked such control:

- Arrow did not decide what tasks Grant would perform within the warehouse—WTEC did. *Cf. Sparger*, 547 S.W.2d at 585–86 (holding—in vicarious liability case when a sponge was left in a patient—that nurses were hospital's general employees rather than surgeon's special employees in part because the hospital selected the nurses, assigned them "specific duties," and provided procedures for counting sponges that were "intended for use regardless of the surgeon").

---

[27]Because Grant's live petition did not distinguish between the defendants in alleging negligence, his pleadings are ambiguous regarding whether his "safe workplace" argument asserts a negligent activity or a premises liability theory. Even on appeal, Grant hints at both, alleging that Arrow "sent him into a dangerous workplace" at WTEC. But because Grant concedes that Arrow did not own, lease, or control WTEC's facility, and because he repeatedly refers to the duty to train and supervise employees, we construe his theory as one of negligent activity. *Cf. Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993) (stating in lessee–lessor context that "in a case alleging negligence in maintaining a safe workplace, the court's inquiry must focus on who had specific control over the safety and security of the premises, rather than the more general right of control over operations").

- Arrow did not control the method by which Grant performed his assigned tasks at the warehouse—WTEC did. *Cf. Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W.2d 277, 278–79 (Tex. 1990) (noting in workers' compensation case that an "[e]xample[] of the type of control normally exercised by an employer include[s] . . . the physical method or manner of accomplishing the end result"); *Hilgenberg*, 198 S.W.2d at 96 (holding in respondeat superior case that tractor driver was not under general employer's direction when he ran over decedent, noting that there was no evidence that general employer had "any control over the driver in the performance of the work either as to the result to be reached or as to the method of reaching the result").

- Arrow did not tell Grant where to go within the warehouse—WTEC did. *See Thompson*, 789 S.W.2d at 278–79 (noting in workers' compensation case that an "[e]xample[] of the type of control normally exercised by an employer include[s] when and where to begin and stop work"); *Hilgenberg*, 198 S.W.2d at 96 (holding in respondeat superior case that tractor driver was under the special employer's direction when special employer "possessed the authority to direct the driver to go backward as well as forward" and that there was no evidence that general employer "possessed the authority to direct the movements of the tractor in any direction").

28

- Arrow did not provide any task-specific training or determine the extent of such training—WTEC did. *Cf. Phillips*, 316 S.W.3d at 188 (holding in workers' compensation case that temporary worker was borrowed servant of client company in part because the client company's "employees trained [the plaintiff] on the work to be performed").

- Arrow did not select or provide any of the task-specific on-site equipment—WTEC did. *Cf. Thompson*, 789 S.W.2d at 278–79 (noting in workers' compensation case that an "[e]xample[] of the type of control normally exercised by an employer include[s] . . . the tools and appliances used to perform the work"); *Producers Chem. Co.*, 366 S.W.2d at 226 (holding that general employer retained control in part because general employer provided the worker and the equipment for a specific "relatively brief" task and that the worker "was accountable only to [the general employer]" in his operation of the relevant equipment); *Martinez v. Boone*, 624 S.W.3d 241, 249 (Tex. App.—El Paso 2021, pet. filed) (noting in vicarious liability case that the "attributes of an employer" include "the furnishing of tools"); *Phillips*, 316 S.W.3d at 188 (holding in workers' compensation case that temporary worker was borrowed servant of client company in part because the client company "provided the machines, tools, and raw materials for [the plaintiff's] work").

- On the day of Grant's injury, Arrow did not instruct Grant to help on the saw line or to stand where he stood—WTEC did. *Cf. Garza*, 161 S.W.3d at 477 (concluding in workers' compensation case that client company controlled details of the work that gave rise to the injury where temporary worker "was injured when he responded to direct instructions from [the client company] supervisor").

Although Grant emphasizes—as he did with WTEC—that he had "applied for a job with Arrow, [had] interviewed with Arrow, and [had been] hired by Arrow," these administrative functions do not speak to actual control of the liability-producing aspects or circumstances of Grant's work. *Cf. St. Joseph Hosp.*, 94 S.W.3d at 543 (noting that although the teaching hospital controlled the residents' training and set the parameters for their schedules and patients, it did not control the residents' medical tasks while the residents were on rotation at the specific location at issue); *In re Peterson Constr., Inc.*, No. 13-15-00535-CV, 2016 WL 3548643, at *9 (Tex. App.—Corpus Christi–Edinburg June 17, 2016, orig. proceeding) (mem. op.) (recognizing that "[t]he fact that an employer issued payroll checks" or maintained the ability to hire and fire "d[id] not necessarily establish that the employer had the right of control over the employee's work"); Restatement (Second) of Agency § 227 ill. 3 (Am. Law Inst.1958)[28] (illustrating doctrine

---

[28] *See also Sparger*, 547 S.W.2d at 583 (citing Restatement (Second) of Agency § 227 (Am. Law Inst. 1958), for borrowed servant doctrine).

by explaining that if "P, a master carpenter, by agreement with B, sends A, a skilled cabinetmaker, to work with B's servants for a week, under the direction of B's foreman, in the reconstruction of a stairway," and "[f]or this B is to pay P an agreed amount," then "A acts as the servant of B in building the stairway"); *cf. also Morris v. Scotsman Indus., Inc.*, 106 S.W.3d 751, 754 (Tex. App.—Fort Worth 2003, no pet.) ("A court cannot infer duty from evidence showing . . . control over the general operation of the workplace.").

Grant also argues that his coworker's belief that he was an Arrow employee created a fact issue, but this argument is problematic for several reasons. First, Grant's coworker premised his characterization of the employment relationship on the administrative indicia discussed above and on his belief that "WTEC doesn't hire employees until after a year of being with their temp service." Grant's coworker did not support his employment characterization with any facts regarding Arrow's control over the details of Grant's work. And testimony "that merely asserts the existence of an employment relationship without providing specific[, relevant] supporting facts is not competent evidence of the alleged employment relationship." *Goldren Agri-Res. Ltd. v. Fulcrum Energy LLC*, No. 01-11-00922-CV, 2012 WL 3776974, at *11 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. denied) (mem. op.); *cf. Waste Mgmt. of Tex.*, 622 S.W.3d at 283–84 (addressing right-to-control test in workers' compensation context and holding that "no fact issue is raised when the only evidence cutting against [the entity's] right to control [the plaintiff] . . . is a bare contractual label"). This is particularly true in the borrowed servant context because multiple entities are involved.

31

Second, the mere fact that Arrow might have been Grant's general employer for *some* purposes and activities would not mean that it was his common law employer for all purposes and all activities. *See St. Joseph Hosp.*, 94 S.W.3d at 537–38 (quoting summary of borrowed servant doctrine in Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 52.2 (1997)).

Again, Grant has conceded that he presented no evidence that Arrow controlled WTEC's workplace, and Grant's negligence claims are based on alleged deficiencies in that workplace—primarily his lack of training, faulty equipment, and inadequate supervision. Thus, there is no evidence that Arrow was Grant's common law employer with respect to the claims at issue.

### 3. Conclusion

Because Grant failed to present more than a scintilla of evidence that Arrow was his common law employer with respect to the claims at issue, and because Arrow's status as Grant's alleged employer was the basis for the duty element of Grant's negligence and negligence per se claims, Grant has failed to raise a genuine issue of material fact on these claims sufficient to defeat Arrow's no-evidence motion for summary judgment. "[T]he 'nonexistence of a duty ends the inquiry into whether negligence liability may be imposed.'" *Little v. Delta Steel, Inc.*, 409 S.W.3d 704, 717 (Tex. App.—Fort Worth 2013, no pet.) (quoting *Morris*, 106 S.W.3d at 754). We hold that the trial court properly granted summary judgment in Arrow's favor. *See* Tex. R. Civ. P. 166a. We overrule Grant's second issue.

## D. Severance

Finally, in his fourth issue, Grant contends that the trial court erred by severing WTEC's and Arrow's summary judgments.

Rule 41 of the Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." Tex. R. Civ. P. 41. The trial court has broad discretion in granting a severance, and the trial court's decision will not be reversed absent an abuse of discretion. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh'g).

"A severance after an interlocutory summary[ ]judgment order to expedite appellate review is proper and not an abuse of discretion." *Nicholson v. Stockman*, No. 02-19-00103-CV, 2020 WL 241420, at *2 (Tex. App.—Fort Worth Jan. 16, 2020, pet. denied) (mem. op.); *see Arredondo v. City of Dall.*, 79 S.W.3d 657, 665 (Tex. App.—Dallas 2002, pet. denied) ("If summary judgment in favor of one defendant is proper in a case with multiple defendants, severance of that claim is proper so it can be appealed.").

Here, Grant's case involved multiple defendants, and the trial court granted interlocutory summary judgments in favor of two of those defendants: WTEC and Arrow. The trial court did not abuse its discretion by severing the interlocutory summary judgments to make them final and expedite appellate review. *See Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525–26 (Tex. 1982) (holding that severance of summary judgment "in an effort to expedite appellate review" was not an abuse of discretion); *Nicholson*, 2020 WL 241420, at *2 (holding no abuse of discretion occurred

when trial court severed interlocutory summary judgments that disposed of some but not all defendants); *Smith v. Tex. Farmers Ins. Co.*, 82 S.W.3d 580, 587–88 (Tex. App.—San Antonio 2002, pet. denied) (similar).  We overrule Grant's fourth issue.

### III.  Conclusion

Having overruled Grant's four issues, we affirm the trial court's summary judgments.  *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  July 21, 2022